**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **JOSÉ FELICIANO-BOLET, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **CASE NO. 14-1631 (GAG)** |
| **PUERTO RICO ELECTRICAL POWER AUTHORITY, et al.,** | |
| **Defendants.** | |

## OPINION AND ORDER

José Feliciano-Bolet ("Plaintiff"), his wife Maria Mejías-Calero and the conjugal partnership Feliciano-Mejías, (collectively "Plaintiffs") brought this political discrimination action against the following co-defendants: the Puerto Rico Electrical Power Authority ("PREPA"); Jorge F. Hernández-Pérez ("Hernández-Pérez") in his personal capacity and official capacity as Regional Administrator of PREPA, his wife Zoraida Fuentes-Moure and the conjugal partnership Hernández-Fuentes; Juan Alicea-Flores ("Alicea-Flores") in his personal capacity and official capacity as Executive Director of PREPA, his wife Jane Doe and the conjugal partnership composed by them; Victor M. Oppenheimer-Soto ("Oppenheimer-Soto") in his personal capacity and official capacity as Head of the Labor Affairs Division of PREPA, his wife Janet Doe and the conjugal partnership composed by them; Maria M. Méndez-Rivera ("Méndez-Rivera"), in her personal capacity and official capacity as Secretary of PREPA's Board of Directors and Human Resources Director, her husband John Doe and the conjugal partnership composed by them.

Civil No. 14-1631 (GAG)

(Docket No. 1 ¶¶ 6-14.)  Due to the similarity of the claims against them, these co-defendants will be hereinafter referred to as the "PREPA Defendants".

Plaintiff also sued Manuel Pérez-Soler ("Pérez-Soler"), his wife Maria Adames-Aquino and the conjugal partnership Pérez-Adames; Angel Figueroa-Jaramillo ("Figueroa-Jaramillo"), his wife Jill Doe and the conjugal partnership composed by them; Juan A. Morales-López ("Morales-López"), his wife Jenny Doe and the conjugal partnership composed by them; Angel Alicea-Mercado ("Alicea-Mercado"), his wife Susan Doe and the conjugal partnership composed by them; Carlos Lugo-Martínez ("Lugo-Martínez"), his wife Susan Roe and the conjugal partnership composed by them; Javier Nieves-Pellot ("Nieves-Pellot"), his wife Susie Doe and the conjugal partnership composed by them; Rafael Velez-Alcaide ("Velez-Alcaide"), his wife Susie Roe and the conjugal partnership composed by them; Edwin Rodríguez-López  ("Rodríguez-López"), his wife Sully doe and the conjugal partnership composed by them.  Due to the similarity of the claims against them and as President and President of the Arecibo Chapter of the Unión de Trabajadores de la Industria Eléctrica y Riego ("UTIER"), respectively, co-defendants Pérez-Soler and Figueroa-Jaramillo will be referred to as the "UTIER Defendants" (collectively the PREPA Defendants and the UTIER Defendants will be referred to as the "Defendants").  (Docket No. 1 ¶¶ 3-30.)

Plaintiffs seek redress for alleged acts of discrimination in violations of their rights under the First, Fifth and Fourteenth Amendments to the United States Constitution, pursuant to section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983.  Id. ¶¶ 1, 85, 91.  In addition, Plaintiffs invoke the Court's supplemental jurisdiction, under 28 U.S.C. § 1367, for claims arising under article II, sections 1,4 and 7 of the Puerto Rico Constitution and article 1802 of the Puerto Rico Civil Code, P.R. LAWS ANN. tit. 31, § 5141.  Id. ¶¶ 1, 94, 96.

Civil No. 14-1631 (GAG)

Currently before the Court are the PREPA Defendants' motion for summary judgment (Docket No. 124) and the UTIER Defendants' motion for summary judgment (Docket No. 128), both seeking dismissals of all claims.

## I.      Relevant Factual and Procedural Background[1]

Plaintiff worked for PREPA for over twenty years and retired from the company on July 18, 2015.  (Docket Nos. 125 ¶¶ 1,36; 144 ¶¶1, 36.)    He is an active member of the New Progressive Party ("NPP").  (Docket Nos. 125 ¶¶ 26,27; 144 ¶ 26,27.)  At the time in which the events relevant to this case took place, Plaintiff was a supervisor at the PREPA Commercial Office in Isabela.  (Docket Nos. 125 ¶ 1; 144 ¶ 1.)  The Popular Democratic Party ("PDP") won the 2012 general elections.  (Docket Nos. 1 ¶ 37; 20 ¶ 37; 66 ¶ 37.)  Thereafter, on July, 2013, Plaintiff was transferred from the Isabela Commercial Office to the Arecibo Commercial Office.  (Docket Nos. 1 ¶ 45; 20 ¶ 45; 66 ¶ 45.)  At the time that the events of this case took place, Alicea-Flores was Executive Director of PREPA, Oppenheimer-Soto was Head of the Labor Affairs  Division of PREPA, Méndez-Rivera was Secretary of PREPA's Board of Directors and Human Resources Director, Hernández-Pérez was Regional Administrator of PREPA, Pérez-Soler was President of the Aguadilla Chapter of the UTIER and   Figueroa-Jaramillo was President of the UTIER.  (See Docket Nos. 125 ¶ 3; 128 ¶¶ 2-3; 144 ¶ 3; 151 ¶¶ 2-3.)

Around July, 2013, PREPA's management received information related to an alleged fraudulent scheme where employees of the Isabela commercial office were claiming to have worked hours not actually worked. (Docket Nos. 125 ¶ 6; 144 ¶ 6.) During collective-bargaining negotiations unrelated to the present case that were taking place between PREPA and the UTIER

---

[1] The court states the facts in the light most favorable to Plaintiff. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  See also López-Erquicia v. Weyne-Roig, No. 13-1915, 2015 WL 5330384, at *2 (D.P.R. Sept. 14, 2015).

Civil No. 14-1631 (GAG)

around that time, Oppenheimer-Soto informed Pérez-Soler about certain irregularities that had allegedly taken place at the Isabela commercial office concerning several UTIER members. (Docket Nos. 128 ¶ 11; 151 ¶ 11.)  As a result, an internal investigation was launched, which culminated in the preparation of a document titled "Notification of the Results of the Verification of the In and Out Times of the Isabela District Office" by PREPA's internal auditors dated August 5, 2013 ("Verification Notification").  (Docket Nos. 125 ¶ 8; 144 ¶ 8.)

As part of the internal investigation, PREPA's internal auditors compared the entrance and exit times from March 17 to May 25 of 2013 of all of the employees of the Isabela commercial office, according to the records kept by the office's security guards ("Security Logs"), against the times recorded by the employees on the Bi-Weekly Attendance Reports ("Time Sheets").  (Docket Nos. 125 ¶¶ 9, 11; 125-1 at 1.)  Based on this comparison, the Verification Notification concluded that thirty-eight employees reflected differences between the times that they claimed to have worked and the times that their cars arrived and left the Isabela office. (Docket Nos. 125 ¶ 12; 144 ¶ 12.) These thirty-eight employees had 754 differences which ranged from 1 to 434 minutes, for a total of 29,264 minutes.  (Docket Nos. 125 ¶ 12; 125-1 at 2; 144 ¶ 12.)

Oppenheimer-Soto made a determination to suspend the employees that, according to the Verification Notification, reflected a difference of over 400 minutes.  (Docket Nos. 125 ¶ 14; 144 ¶ 14.)  As a result, twenty-one employees were suspended on August 19, 2013.  (Docket Nos. 125 ¶ 15; 144 ¶ 15.)  Plaintiff was among the employees suspended on that day.  Id.

Plaintiff was suspended on August 19, 2013, with pay, for allegedly allowing employees under his supervision to record on their Time Sheets hours not worked and having certified that the information in said time cards was correct.  (Docket Nos. 125 ¶ 16; 144 ¶ 16.)  Plaintiff's suspension letter indicated that he was being suspended from work, but not salary, and that an

Civil No. 14-1631 (GAG)

informal hearing would be held on August 22, 2013.  (Docket Nos. 125 ¶¶ 18-19; 144 ¶¶ 18-19.)

Plaintiff was also notified that in said hearing PREPA's management would present the evidence

against him and that he would have the opportunity to be accompanied by an attorney or any other

person of his trust, be able refute such evidence, offer his version of the alleged events, and present

any defenses that may exonerate him.  (Docket Nos. 125 ¶ 18-20; 144 ¶¶ 18-20.)

The same day that the suspension letters were received, Pérez-Soler received a call from a

union member assigned to the Isabela commercial office informing him about the suspensions.

(Docket Nos. 128 ¶ 12; 144 ¶ 12.)  As a result, Pérez-Soler immediately called Oppenheimer-Soto,

who agreed to meet the following day.  Id.  Pérez-Soler also to request that he meet that same day

with the UTIER members that had been suspended.  (Docket Nos. 128 ¶ 13; 144 ¶ 13.)

Five employees under Plaintiff's supervision accepted the settlement agreements proposed

by PREPA and provided sworn statements in which they declared under oath that Plaintiff

authorized them to misrepresent in their time sheets the hours that they worked and to use official

vehicles for personal use.  (Docket Nos. 125 ¶ 17; 144 ¶ 17.)

On August 22, 2013, the informal hearing against Plaintiff was held in PREPA's Arecibo

regional office.  (Docket Nos. 125 ¶¶ 18-19; 144 ¶¶ 18-19.)  Plaintiff was represented by attorneys

Alcover Delgado and Francisco González-Magaz.  (Docket Nos. 125 ¶ 23; 144 ¶ 23.)  During the

hearing, Hernández-Pérez explained to Plaintiff the disciplinary charges that had been filed against

him and offered the opportunity to present his version of the relevant facts surrounding the alleged

fraudulent scheme.  (Docket Nos. 125 ¶ 20; 144 ¶ 20.)  Plaintiff opted to invoke his right to remain

silent and offered no justification for the discrepancies shown between the times that five of the

employees under his supervision claimed to have worked and the times that their cars arrived and

left the Isabela commercial office, according to the Security Logs.  Id.

Civil No. 14-1631 (GAG)

The same day in which the informal hearing was held, Hernández-Pérez issued an "Investigation Report" which concluded that Plaintiff allowed employees under his supervision to use official vehicles for personal use during the days of April 24, 25, 26, 29 and 30 of 2013. (Docket Nos. 125 ¶ 21; 144 ¶ 21.)   The Investigation Report also stated that Plaintiff allowed employees under his supervision to record on their Time Sheets hours that did not coincide with their entrance and exit times according to the Security Logs.   (Docket Nos. 125 ¶ 21; 144 ¶ 21.) The Investigation Report recommended that charges be filed against Plaintiff for violations of Rule of Conduct 17 of the Electric Power Authority Administrative Manual ("Administrative Manual"). (Docket Nos. 125 ¶ 21; 144 ¶ 21.)   The rule reads as follows: "The misappropriation, intentional misuse or mismanagement of property, equipment, materials, funds, goods, benefits or services of the Authority, its customers, contractors or employees is not allowed." (Docket Nos. 125 ¶ 30; 144 ¶ 30; 162-7.)   The Administrative Manual states that a violation to Rule 17 entails a "Permanent Separation from Employment" after the first violation.  Id.

On August 23, 2013, Plaintiff was sent a copy of the Investigation Report along with a letter informing of the disciplinary charges that were filed against him and that he was being suspended from his employment without pay.   (Docket Nos. 125 ¶ 24; 144 ¶ 24.)   Plaintiff was also notified of his right to request an administrative hearing, which he did.  Id.  On June 2, 2014, after a formal hearing was held, Plaintiff was reinstated to his employment.   (Docket Nos. 125 ¶ 34; 144 ¶ 34.)   He was reimbursed $36,027.38 by PREPA for the salaries that he failed to receive during his suspension without pay.   (Docket Nos. 125 ¶ 35; 144 ¶ 35.)   Plaintiff retired from PREPA on July 18, 2015.   (Docket Nos. 125 ¶ 36; 144 ¶ 36.)   The administrative proceedings regarding the disciplinary charges against Plaintiff had not yet concluded.  Id.

Civil No. 14-1631 (GAG)

On August 18, 2014, Plaintiffs filed the present complaint.  (Docket No. 1.)  In the complaint, Plaintiffs claim that the PREPA Defendants conspired with the UTIER Defendants to remove Plaintiff from his employment at PREPA solely because of his affiliation to the New Progressive Party (NPP).  Id. ¶¶ 6-30.  The PREPA Defendants counter that Plaintiff was validly suspended from his employment because he allegedly allowed employees under his supervision to use official vehicles for personal transportation and authorized some of his employees' Time Sheets which did not accurately represent the hours that were worked.  (Docket No. 20 at 8.)  On the other hand, the UTIER Defendants moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule (b)(6).  (See Docket No. 39.)  Their main contention was that, as either members or leaders of the UTIER and due to the fact that they had no management authority inside PREPA with which to affect Plaintiff's rights, they did not act under color of state law.  Id. ¶¶ 1.1-1.2.  This meant that they could not be defendants to a section 1983 action.  Id. ¶ 1.6.

On May 19, 2015, this Court issued an Opinion and Order ruling on the UTIER Defendants' motion to dismiss.  (See Docket No. 56.)  The Court granted the motion to dismiss as to co-defendants Adames-Aquino, Morales-Lopez, Alicea-Mercado, Lugo-Martínez, Nieves-Pellot and Velez-Alcaide, their spouses and the conjugal partnership composed by them, because Plaintiffs failed to plead sufficient facts on the existence of a conspiracy to maintain a section 1983 action against those co-defendants.  Id. at 10.  The motion to dismiss, however, was denied as to the UTIER Defendants, given that the Court found that Plaintiffs had adequately pleaded sufficient facts to support a determination that co-defendants Pérez-Soler and Figueroa-Jaramillo acted under color of state law in depravation of Plaintiff's constitutional rights.  Id. at 11.

Civil No. 14-1631 (GAG)

Subsequently, the UTIER Defendants answered the complaint and argued that they had nothing to do with Plaintiff's dismissal and that they could not be considered state actors for purposes of being a defendant in a section 1983 action.  (Docket No. 66 ¶¶ 13-19.)  They also denied having coerced or forced any union members into signing the settlement agreements or to provide the sworn statements against Plaintiff.  Id. ¶ 20.

The PREPA Defendants moved for summary judgment arguing that the undisputed material facts proved that Plaintiff's political affiliation did not play a role in the decision to suspend him from his employment and that such course of action was entirely motivated by Plaintiff's misconduct.  (Docket No. 124 at 17.)  Plaintiffs responded, arguing that there were material facts in controversy that did not allow for their claims against the PREPA Defendants to be summarily dismissed, including the existence of a conspiracy that led to the fabrication of the charges against Plaintiff.  (Docket No. 143 at 12.)  The PREPA Defendants replied, noting that Plaintiff did not adequately deny, and thus should be deemed admitted, several material facts, including that he approved time-sheets in which employees under his supervision claimed to have worked hours that did not correspond to the entrance and exit logs kept by the security guards of the Isabela commercial office.  (Docket No. 156 ¶ 21.)

The UTIER Defendants also timely moved for summary dismissal of the claims against them, averring that the undisputed facts of the case showed that they did not conspire with the PREPA Defendants to violate Plaintiff's rights and thus could not be considered as state actors for purposes of a section 1983 action.  (Docket No. 127 ¶ 1.1.)  Plaintiff responded, arguing that there was evidence on the record proving that the UTIER Defendants met with the PREPA Defendants prior to Plaintiff receiving his initial suspension letter, and that during that meeting they agreed to force the employees under Plaintiff's supervision to provide sworn statements that would be used

Civil No. 14-1631 (GAG)

to deprive Plaintiff of his employment at PREPA on account of his NPP affiliation.  (Docket No. 150 at 6-7.)

## II.     Plaintiffs' Response to Defendants' Statement of Uncontested Material Facts and Other Evidentiary Matters

As a threshold matter, the Court addresses some of Plaintiffs' responses to the PREPA and UTIER Defendants' Statements of Uncontested Material Facts.   (Docket Nos. 144 & 151.) Specifically, the Court will address Plaintiffs' compliance with Rule 56(c) and its requirement that a party seeking to controvert an assertion of fact do so by citing admissible evidence on the record that shows the presence of a genuine dispute.   See FED. R. CIV. P. 56(C). This rule must be considered along with Local Rule 56(c), which adds:

> The opposing statement shall admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts. *Unless a fact is admitted, the opposing statement shall support each denial or qualification by a record citation as required by this rule.*

L. Cv. R. 56(c) (D.P.R. 2009) (emphasis added).  This is especially important when it is considered that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Id. R. 56(e).

The materials cited on the record by the non-movant to show the presence of a genuine issue of material fact must have "evidentiary value".  Inadmissible evidence "such as inadmissible hearsay, may not be considered on summary judgment." Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005) (citation omitted).

Civil No. 14-1631 (GAG)

A. The alleged Noti-Uno Interview

According to the PREPA Defendants, Hernández-Pérez received "an anonymous call urging him to investigate irregularities in the payrolls of employees at the office at Isabela who were not signing up the correct hours that had been worked."  (Docket No. 125 ¶ 6.)  Plaintiffs attempted to deny this fact, averring that Hernández-Pérez "is contradicted by the expressions made by Maria Mendez, Director of Human Resources and Labor Affairs Division of PREPA who in an interview for the press (Noti-Uno), stated that Hernández-Pérez had in fact received a complaint from a female manager." (Docket No. 144 ¶ 6.)

The evidence in the record that Plaintiffs point to is Plaintiff's deposition, where he claimed that Méndez-Rivera had made the alleged statement in an interview for "Noti-Uno". (Docket Nos. 144 ¶ 6; 144-1 at 61.)  Independent of the fact that Plaintiffs failed to even provide evidence of this alleged interview, the evidence provided is clearly inadmissible hearsay.  See FED. RS. EVID. 801 & 802.

Plaintiffs' seek to introduce Plaintiff's declarations as proof that Méndez-Rivera made the alleged statement to Noti-Uno.  In turn, they seek to introduce Méndez-Rivera's alleged statements as proof that Hernández-Pérez actually found out about the fraudulent scheme from a female manager and not an anonymous phone-call, as the PREPA Defendants claim. In other words, multiple hearsay.

The declarant of the statement that Plaintiffs seek to introduce into evidence is Méndez-Rivera, who was not present at Plaintiff's deposition. The declaration was offered into evidence to prove the truth of the matter asserted in the statement: that Hernández-Pérez was first told about the alleged fraudulent scheme at the Isabela commercial office by an unnamed female manager. As such, the declaration is inadmissible hearsay and will not be considered by this Court.

Civil No. 14-1631 (GAG)

 

### B.   Spanish language documents

The PREPA Defendants claim that there is no genuine dispute as to the fact that there is no prohibition for the use of the Security Logs to corroborate discrepancies.  (Docket No. 125 ¶ 10.)  Plaintiffs attempted to controvert this assertion by claiming that:

> PREPA itself has in the past determined that the security logs should not be used to determine the attendance or entrance and exit of employees. In 2011, PREPA consulted this matter with their own Labor Department which issued a letter establishing the invalidity of using said security logs for any sort of measure of attendance or entrance and exit of employees.

(Docket No. 144 ¶ 10.)  The document cited in support is titled "Opinion of July 18, 2011". (Docket No. 144-9.)  This document, however, was prepared in the Spanish language and Plaintiffs did not file a certified translation of the document.  This is a clear violation to Local Rule 5(g), which states that "[a]ll documents not in the English language which are presented or filed, whether as evidence or otherwise, must be accompanied by a certified translation . . . ." L. Cv. R. 5(g).

As a result, the Court will not consider the exhibit titled "Opinion of July 18, 2011" filed by Plaintiffs at Docket No. 144-9.  See Cordero-Soto v. Island Fin., Inc., 418 F.3d. 114, 118 (1st Cir. 2005).

### III.     Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see FED. R. CIV. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, . . . and material if it

Civil No. 14-1631 (GAG)

'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'"  Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted).  The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case.  Celotex, 477 U.S. at 325.  "The movant must aver an absence of evidence to support the nonmoving party's case.  The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material."  Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).  The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  FED. R. CIV. P. 56(c)(1)(B).  If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of any and all reasonable inferences.  Id. at 255.  Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence.  Id.  Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation."  Forestier Fradera v. Mun. of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

Civil No. 14-1631 (GAG)

### IV.    Legal Analysis

Plaintiff has set forth causes of action against both the PREPA Defendants as well as the UTIER Defendants under 42 U.S.C. § 1983. Plaintiff's section 1983 claims are grounded in alleged violations of his rights under the First, Fifth and Fourteenth Amendment to the United States Constitution.  For a claim to be cognizable under section 1983 of the Civil Rights Act of 1871, a plaintiff must plead and prove three elements of the cause of action: (1) that the named defendant acted under color of state law; (2) that the plaintiff was deprived of federally protected rights, privileges or immunities; and (3) that the defendant's alleged conduct was causally connected to the plaintiff's deprivation.  Gutierrez-Rodriguez v. Cartagena, 882 F. 2d 553, 558 (1st Cir. 1989).  "[Section] 1983 creates no independent substantive rights, but rather provides a cause of action by which individuals may seek money damages for governmental violations of rights protected by federal law."  Cruz-Erazo v. Rivera-Montánez, 212 F.3d 617, 621 (1st Cir. 2000) (citing Albright v. Oliver, 510 U.S. 266, 271 (1994)).

The UTIER Defendants have repeatedly challenged one element of Plaintiff's Section 1983 claim: whether they acted under the color of state law.  If the UTIER Defendants are correct, all of the federal claims against them must be dismissed as there would be no colorable section 1983 claim. The Court will thus first address the UTIER Defendants' motion for summary judgment.

### A.    The UTIER Defendants' Motion for Summary Judgment: Actions Under Color of State Law

"To act under color of state law for [Section] 1983 purposes does not require that the defendant be an officer of the state."  Dennis v. Sparks, 449 U.S. 24, 27 (1980).  It does, however, require that the alleged misconduct causing the deprivation of a plaintiff's rights be fairly

Civil No. 14-1631 (GAG)

attributable to the state.  See Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937 (1982).  The Supreme Court has recognized the ability to hold a private individual liable under section 1983 if he or she is a willful participant in joint activity with the state or its agents.  See Dennis, 449 U.S. at 27.  To show that the individual's actions are fairly attributable to the state, thereby amounting to state action, the plaintiff must satisfy two elements: (1) the deprivation must be caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state and (2) the party charged with the deprivation must be a person who may fairly be said to be a state actor.  Lugar, 457 U.S. at 937.  Both elements must be present.  Therefore, satisfaction of the first element is not enough to satisfy the state action requirement, because if it were, "private parties could face constitutional litigation whenever they sought to rely on some state rule . . . ." Alberto San, Inc. v. Consejo De Titulares Del Condominio San Alberto, 522 F.3d 1, 4 (1st Cir. 2008).

With respect to the second element, it is well-established that to determine whether a private party can be fairly characterized as a state actor, one of three tests must be met: (1) the state compulsion test; (2) the joint action/nexus test; or the (3) public function test.  Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 4-5 (1st Cir. 2005).  Applicable to the present case is The joint action/nexus test applies in this case because, in the Complaint, Plaintiff alleges that the UTIER Defendants worked in joint activity with the PREPA officials to discriminate against him. (Docket No. 1 ¶¶ 14-17.)  Under this test, "a private party can be held to be a state actor where an examination of the totality of the circumstances reveals that the state has 'so far insinuated itself into a position of interdependence with the private party that it was a joint participant in the [challenged activity].'"  Estades-Negroni, 412 F. 3d at 4-5.  In other words, this test applies "where

14

Civil No. 14-1631 (GAG)

private citizens are participant[s] in joint activity with the State or its agents." Alberto San, Inc., 522 F.3d at 5 (internal quotation marks omitted).

One way to show that a private citizen participated in joint activity with the State or its agents is by showing that the private party engaged in a conspiracy with the State or its agents to form a common goal to violate the plaintiff's federal constitutional rights. See Dennis, 449 U.S. at 27 (holding that private parties who corruptly conspire with a judge act under color of state law, even though the judge is protected by judicial immunity); Adickes v. S. H. Kress & Co., 398 U.S. 144, 152 (1970) (holding that a store employee who reached an understanding with a policeman to deny the petitioners access to a store "plainly provides the state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights"). The First Circuit has noted that a civil rights conspiracy is commonly defined as:

> [A] combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages.

Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988) (citations omitted) (internal quotation marks ommitted); see also Marcello v. Maine, 457 F. Supp. 2d 55, 62-63 (D. Me. 2006). A private party involved in such a conspiracy with the state or its agents is therefore considered to be acting under color of state law to be liable under section 1983 for the deprivation of a plaintiff's constitutional rights. See Adickes, 398 U.S. at 152 ("Private persons, jointly engaged with state officials in the prohibited action, are acting under color of law.").

With respect to the UTIER Defendants, Pérez-Soler and Figueroa-Jaramillo, Plaintiffs allege that, acting together with PREPA Defendants, they "coerced UTIER employees to give false statements against Feliciano-Bonet." (Docket No. 1 ¶ 14, 16.) Specifically, Plaintiff alleges that

Civil No. 14-1631 (GAG)

these defendants met with Oppenheimer-Soto and agreed to reinstate the suspended employees to their jobs under the condition that they issue sworn statements against Plaintiff. Id. at ¶ 70.

Although these allegations were enough for the claims against the UTIER Defendants to survive the motion to dismiss stage, once these defendants moved for summary judgment, the burden fell on Plaintiffs set forth some evidence that would at least raise an issue of fact as to the existence of the conspiracy designed to violate Plaintiff's rights.

The UTIER Defendants claimed as uncontested the fact that they did not coerce the UTIER employees to provide the sworn statements against Plaintiff.  (Docket No. 128 ¶¶ 18, 20.)  Even though Plaintiffs attempted to deny this fact (see Docket No. 151 ¶¶ 18, 20.), in doing so they rely exclusively on citations to Oppenheimer-Soto's deposition, where he mentions that (1) he met with the UTIER Defendants prior to the suspension letters being issued, and that (2) PREPA's upper-management demanded for the UTIER union members to provide sworn statements against their Plaintiff as a condition to reinstating them to their positions at PREPA.  (See Docket No. 151-4 at 20-35.)

It is important to note that this Court is to disregard any attempt to controvert material facts through "conclusory allegations, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative." Tropigas de P.R. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011).  Plaintiffs' contention that the UTIER Defendants conspired with Oppenheimer-Soto, without being accompanied by any evidence that supports the existence of a conspiracy between them such as the one Plaintiff alleges, is precisely the type of unsupported speculation that the First Circuit has ruled does not controvert a properly supported fact in a motion for summary judgment.

Civil No. 14-1631 (GAG)

The uncontested material facts show that the UTIER Defendants were informed of some serious allegations that were made against some UTIER members that worked at the Isabela commercial office (Docket Nos. 128 ¶ 11; 151 ¶ 11.), allegations that may have resulted in dismissals and criminal charges.  (Docket Nos. 128 ¶ 14; 151 ¶ 14.)  As part of their duties as high-ranking union leaders, the UTIER Defendants attempted to negotiate with PREPA's upper-management an agreement that would avoid the termination or filing of criminal charges against union members.  (Docket Nos. 128 ¶ 16; 151 ¶ 16.)  They were successful in obtaining preliminary settlement agreements that avoided dismissals and criminal charges as to all but one of the implicated union members.  Id.

Afterwards, Pérez-Soler presented the agreements to the implicated union members and explained the consequences of accepting or rejecting the proposed agreements.  (Docket Nos. 128 ¶ 17; 151 ¶ 17.)  He also explained that the decision of whether to accept the proposed agreements and provide the sworn statements required by PREPA, or not, was up to each individual member.  (Docket Nos. 128 ¶ 18; 151 ¶ 18.)  He was clear in that any statements that were provided had to be truthful.  Id.  Figueroa-Jaramillo did not force any union members to sign, nor did he order any union official to coerce or force other union members to sign, PREPA's proposed settlement agreements.  (Docket Nos. 128 ¶ 20; 151 ¶ 20.)

Plaintiffs did not adequately deny any of these facts.  (See Docket No. 151 ¶¶ 11, 14, 16-18, 20.)  As support for their denials of these facts, Plaintiffs repeatedly argue that Oppenheimer-Soto and the UTIER Defendants discussed the settlement agreements before August 19, 2013, when the suspension letters were issued. (See Docket Nos. 151 ¶¶ 12-17.)  Plaintiffs, however, have not pointed to a single piece of evidence that supports their contention that when the UTIER Defendants met with Oppenheimer-Soto, regardless of when the meeting and settlement

Civil No. 14-1631 (GAG)

discussions actually took place, they agreed to conspire against Plaintiffs' rights. The fact that the UTIER Defendants may have met with Oppenheimer-Soto to discuss the settlement agreements prior to the suspension letters being issued, as Defendants claim, does not support a finding that they conspired to violate Plaintiff's rights, much less that they coerced the members of their union into providing false sworn statements against Plaintiff. As was previously mentioned, even prior to the suspension letters being issued on August 19, 2013, Oppenheimer-Soto had already reached out to Pérez-Soler to let him know about the allegations that he had received against the UTIER members from the Isabela commercial office. (Docket Nos. 128 ¶ 11; 151 ¶ 11.) By July of 2013, Pérez-Soler had already communicated to Oppenheimer-Soto his desire for something to be "worked out". Id. Thus, absent further proof that may suggest improper motives or the existence of a scheme intended to violate Plaintiff's rights, there is nothing about the evidence that Plaintiffs have provided that would suggest that when the UTIER Defendants met with Oppenheimer-Soto they did anything other than negotiate a mutually acceptable agreement intended to avoid the dismissal of their union members. (Docket Nos. 128 ¶ 16; 151 ¶ 16.)

In sum, Plaintiffs have failed to point to any evidence that a reasonable jury could interpret as providing for the existence of the alleged conspiracy. In light Plaintiff's failure to adequately controvert that the UTIER Defendants did not coerce the employees under Plaintiffs to provide the sworn statements against him, this Court must deem such fact as admitted. L. Cv. R. 56(c). As a result, the UTIER Defendants cannot be considered state actors for purposes of a section 1983 claim, given that the record is completely devoid of any evidence that may implicate these private actors in the alleged violation of Plaintiff's rights.

Accordingly, for the reasons stated above, this Court **GRANTS** the UTIER Defendants' motion for summary judgment at Docket No. 128 as to all claims against co-defendants Pérez-

Civil No. 14-1631 (GAG)

Soler, Figueroa-Jaramillo, their spouses and the conjugal partnership composed by them.  As a result, only the claims against the PREPA Defendants remain, which the Court proceeds to consider next.

        B.   Procedural Due Process

        The Due Process Clause of the Fourteenth Amendment proscribes states from depriving "any person of life, liberty, or property, without due process of law". U.S. CONST. amend. XIV, § 1.  This due process guarantee has both procedural and substantive aspects.  See Parker v. Hurley, 514 F.3d 87, 101 n.14 (1st Cir. 2008). To succeed on a procedural due process claim, a plaintiff must show that he was deprived of a life, liberty, or property interest without the requisite minimum measure of procedural protection warranted under the circumstances. See Romero–Barceló v. Hernández–Agosto, 75 F.3d 23, 33 (1st Cir.1996).

        A viable procedural due process claim must demonstrate a "deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' . . . without due process of law." Id. 75 F.3d at 32 (citations omitted).  "The Due Process Clause of the Fourteenth Amendment protects government employees who possess property interests in continued public employment."  Ruiz–Casillas v. Camacho–Morales, 415 F.3d 127, 134 (1st Cir. 2005) (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)).  To determine whether public employees possess such a property right, the First Circuit requires that the court examine local law and the terms and conditions of the employment arrangement.  Ruiz–Casillas, 415 F.3d at 134.

        Under Puerto Rico law, career employees have a property interest in their continued employment.  Garnier v. Rodriguez, 506 F.3d 22, 27 (1st Cir. 2007) (citing González–de–Blasini v. Family Dept., 377 F.3d 81, 86 (1st Cir. 2004)).  Due process requires that prior to a deprivation of life, liberty, or property the individual being deprived of said interest be given notice and an opportunity for a hearing.  See Herwins v. City of Revere, 163 F.3d 15, 18 (1st Cir. 1998) (citing

Civil No. 14-1631 (GAG)

Memphis Light, Gas and Water Div. v. Craft, 436 U.S. 1, 19 (1978)).  The "root requirement" is that an individual be given an opportunity to be heard before he is deprived of any significant property interest.  Loudermill, 470 U.S. at 542 (quoting Boddie v. Connecticut, 401 U.S. 371, 379 (1971)).

The PREPA Defendants have not disputed that plaintiff Feliciano-Bolet held a career position at PREPA.  (See Docket No. 124 at 7.)  Thus, Plaintiff possessed a property interest in his continued employment at PREPA.  Garnier, 377 F.3d at 27.  In order to deprive Plaintiff of this property interest, PREPA must have offered him the minimal procedural protections that were required under the circumstances of his specific case.  See Romero–Barceló, 75 F.3d at 33. The parties dispute whether PREPA complied with this constitutional requirement.

Plaintiff was initially suspended from work with pay. (Docket Nos. 125 ¶ 16; 144 ¶ 16.) Plaintiff was notified of this initial suspension on August 19, 2013 via a letter written by Hernández-Pérez.  Id.  The letter indicated that he was being suspended as a result of certain events that occurred on the days of April 24, 25, 26, 29 and 30 of 2013, where Plaintiff allegedly allowed employees under his supervision to use official vehicles for personal use and misrepresent the amount of hours that they actually worked.  Id.  Plaintiff was also notified that an informal hearing on his case would be held on August 22, 2013. (Docket Nos. 125 ¶ 18; 144 ¶ 18.)

During the informal hearing, Plaintiff was accompanied by an attorney, was explained the disciplinary charges that were filed against him and had the opportunity to offer his version of the relevant facts. (Docket Nos. 125 ¶ 20; 144 ¶ 20.)  Plaintiff, however, declined the opportunity to present his case.  Id.  On August 22, 2013, after the informal hearing, Plaintiff was sent a letter informing him that he was being suspended from both employment and salary as a result of his violation of Rule of Conduct 17 of the Administrative Manual.  (Docket Nos. 125 ¶ 23; 125-4.)

Civil No. 14-1631 (GAG)

Plaintiff was also sent a copy of the Investigation Report prepared by PREPA's management regarding the events that led to Plaintiff's suspension.  (Docket No. 125 ¶ 24.)  The suspension letter also notified Plaintiff of his right to request a formal administrative hearing.  Id.  ¶ 24.

Under the circumstances, PREPA's actions did not violate Plaintiffs' procedural due process rights.  The First Circuit has held that for a pre-termination hearing to fulfill due process requirements it must serve as an initial check against mistaken decisions.  Marrero-Gutierrez v. Molina, 491 F.3d 1, 8 (1st Cir. 2007) (citations omitted). This initial check requires that "the employee receive notice of the charges, an explanation of the evidence that supports those charges, and the ability to refute that evidence."  Id.  Based on the uncontested facts in this case, it is clear that plaintiff Feliciano-Bolet received the minimum procedural protections guaranteed by the Due Process Clause of the Fourteenth Amendment.  (See Docket Nos. 125 ¶¶ 18-24; 144 ¶¶ 18-24.)

Accordingly, the Court **GRANTS** the PREPA Defendants' motion for summary judgment in regards to Plaintiffs' claims under the Due Process Clause of the Fourteenth Amendment.

C.  First Amendment Claims

The First Amendment to the United States Constitution embodies the right to be free from political discrimination.  Barry v. Moran, 661 F.3d 696, 699 (1st Cir. 2011).  The First Circuit has held such right prohibits government officials from "taking adverse action against public employees on the basis of political affiliation, unless political loyalty is an appropriate requirement of the employment."  Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 11 (1st Cir. 2011) (internal citations omitted).

**1.  Political Discrimination Prima Facie Case**

A *prima facie* case of political discrimination based on the First Amendment consists of four elements: "(1) that the plaintiff and defendant have opposing political affiliations, (2) that the

Civil No. 14-1631 (GAG)

defendant is aware of the plaintiff's affiliation, (3) that an adverse employment action occurred, and (4) that political affiliation was a substantial or motivating factor for the adverse employment action." Lamboy-Ortiz v. Ortiz-Vélez, 630 F.3d 228, 39 (1st Cir. 2010). The Plaintiffs "must point 'to evidence on the record which, if credited, would permit a rational fact-finder to conclude that the challenged personnel action occurred and stemmed from a politically based discriminatory animus.'" González-De-Blasini v. Family Dept., 377 F.3d 81, 85 (1st Cir. 2004) (quoting LaRou v. Ridlon, 98 F.3d 659, 661 (1st Cir. 1996)). Additionally, the plaintiff "must make a fact-specific showing that a causal connection exists between the adverse treatment and the plaintiff's political affiliation." Aviles-Martínez v. Monroig, 963 F.2d 2, 5 (1st Cir. 1992) (citing Correa-Martínez v. Arrillaga-Belendez, 903 F.2d 49, 58 (1st Cir. 1990)).

The PREPA Defendants argue that Plaintiffs have not proffered sufficient evidence to satisfy the second and fourth prongs of a *prima facie* case: that the PREPA Defendants were aware of Plaintiff's political affiliation and that it was a substantial or motivating factor for the adverse employment action that he suffered. (Docket No. 125 ¶¶ 26-27.)

The Court thus turns to the issue of whether the PREPA Defendants were aware of Plaintiff's political affiliation. The PREPA Defendants claim as uncontested the fact that they "did not know Plaintiff['s] political or ideological preferences." Id. ¶ 27. (Docket No. 125-12.) Plaintiffs denied this assertion, noting that Pérez-Soler stated during his deposition that Plaintiff's affiliation to the NPP was "widely known in PREPA." (Docket No. 144 ¶ 27.) This Court thus finds that Plaintiffs have set forth sufficient evidence to meet the second prong of a *prima facie* political discrimination claim at this summary judgment stage.

The PREPA Defendants also claim as uncontested the fact that they "did not take into consideration the political affiliation of any of the employees suspended on August 19, 2013".

22

Civil No. 14-1631 (GAG)

(Docket No. 125 ¶ 26.)  Plaintiffs rejected the claim, pointing to the fact that the evidence provided as support is inconsistent with the assertion.  (Docket No. 144 ¶ 26.)  Specifically, Plaintiffs argue that while the PREPA Defendants claim that they did not take into account the political affiliation of <u>any</u> of the employees suspended on August 19, 2013, the only evidence that they offered as support is a statement made by Oppenheimer-Soto during his deposition, in which he claimed that the political affiliation of the <u>union members</u> was never taken into consideration.  (Docket No. 125-12 at 4.)  Plaintiffs claim that Oppenheimer-Soto was not referring to the supervisors that were also suspended on August 19, 2013, including Plaintiff.  (Docket No. 144 ¶ 26.)  For purposes of summary judgment, this fact, as stated by the PREPA Defendants must be deemed as adequately controverted.  FED. R. CIV. P. 56(c)(1)(B).

However, Plaintiffs have not offered any evidence to support their position that the PREPA Defendants did take into account Plaintiff's NPP affiliation before suspending him.  Plaintiffs were only successful in pointing out that Plaintiff's did not adequately support the fact with a citation to evidence on the record, which results in the fact being deemed as controverted for purposes of summary judgment.  (Docket No. 144 ¶ 26.)  <u>See</u> L. Cv. R. 56(c).  For their political discrimination claims to survive summary judgment, however, Plaintiffs must set forth some evidence that a reasonable jury, viewing it in the light most favorable to them and drawing all inferences in their favor, may find to prove that Plaintiff's NPP affiliation was a substantial or motivating factor in the adverse employment action that he suffered.  Plaintiffs have attempted to link the adverse actions that Plaintiff suffered with his NPP affiliation by claiming that all of the supervisors that were suspended belong to the NPP.  (<u>See</u> Docket No. 144 ¶ 25.)  Plaintiffs have also claimed that the fact that the PREPA Defendants demanded that the suspended union

Civil No. 14-1631 (GAG)

members provide sworn statements against Plaintiff as condition for their reinstatement proves discriminatory animus against Plaintiff based on his NPP affiliation.  Id. ¶ 17.

Plaintiffs' evidence tests the minimum limits of what a reasonable jury could find to prove discriminatory animus.  Nevertheless, for purposes of Plaintiffs' *prima facie* case in this summary judgment stage, the Court assumes, *arguendo*, that Plaintiffs have met their evidentiary burden.

## 2.  Mt. Healthy Defense

If the plaintiff proves his *prima facie* case, the burden shifts to the defendant to articulate a non-discriminatory ground for the adverse employment action and establish, by a preponderance of the evidence, that the same action would have been taken regardless of the plaintiff's political beliefs – also known as the Mt. Healthy defense.  Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). In response, "the plaintiff may discredit the proffered nondiscriminatory reason, either circumstantially or directly, by adducing evidence that discrimination was more likely than not a motivating factor."   Padilla-García v. Guillermo Rodríguez, 212 F.3d 69, 77 (1st Cir. 2000).

Accordingly, the burden shifts to the Defendants to provide a non-discriminatory reason for the alleged adverse employment actions.

The PREPA Defendants Mt. Healthy defense proceeds as follows.  Plaintiff was suspended from his employment for committing serious violations to the rules of conduct that he was expected to follow as supervisor of PREPA's Isabela commercial office.  (Docket No. 125 ¶¶ 1, 16, 17, 21, 30.)  Specifically, PREPA believed that Plaintiff facilitated the misappropriation of public funds by authorizing the Time Sheets of employees under his supervision which stated that the employees had worked hours that did not correspond to the times that they were physically in the Isabela commercial office, according to the Security Logs.  Id. ¶¶ 16-17.  He was also believed

**Civil No. 14-1631 (GAG)**

to have authorized those same employees to use PREPA's official vehicles for personal use.  Id. ¶ 17.

According to the PREPA Defendants, Hernández-Pérez received "an anonymous call urging him to investigate irregularities in the payrolls of employees at the office at Isabela who were not signing up the correct hours that had been worked." (Docket No. 125 ¶ 6.)[2]

After PREPA received this anonymous call, an internal investigation was performed.  Id. ¶ 8.  As part of this investigation, a report was prepared by PREPA's Internal Audit Office dated August 5, 2013.  This much is admitted by Plaintiffs.  (Docket No. 144 ¶ 8.)  The parties, however, dispute who ordered the preparation of the report. While the PREPA Defendants claim that it was ordered by the Internal Audit Office, the Plaintiffs counter that it was actually ordered by Hernández-Pérez.  (Docket Nos. 125 ¶ 8; 144 ¶ 8.)

The internal investigation included a comparison of the Time Sheets of the employees from the Isabela commercial office against the Security Logs.  (Docket Nos. 125 ¶ 9; 144 ¶ 9.)  The PREPA Defendants asserted that there is no genuine dispute as to the fact that there is no prohibition for using the Security Logs to corroborate discrepancies.  (Docket No. 125 ¶ 10.)  Since the Court already deemed as inadmissible the document that was cited in support of Plaintiffs' denial (see infra Part II), this assertion of fact must be deemed admitted.  See L. Cv. R. 56(e).

According to the PREPA Defendants, the Verification Notification prepared by PREPA's Internal Audit Office shows that thirty-eight employees of the Isabela commercial office, including employees under Plaintiff's supervision, reflected several differences between their Time Sheets

---

[2] As discussed in Part II, the fact, as set forth by the PREPA Defendants stands uncontroverted. (See Docket Nos. 125 ¶ 6; 144 ¶ 6.)

Civil No. 14-1631 (GAG)

and the corresponding Security Logs.  (Docket Nos. 125 ¶ 12; 144 ¶ 12.)  Plaintiffs qualified this statement, claiming that the Verification Notification does not mention anything specific about Plaintiff or employees under his supervision, including information related to their cars.  (Docket No. 144 ¶ 12.)  In their Reply, the PREPA Defendants point to the fact that the Verification Notification alludes to "an attachment titled 'Verification of Payrolls against Entrance and Exit Records of the Isabela District Office' that contains the details of the differences by day and by employee[.]"  (Docket No. 156 at 5; see also Docket No. 125-1 at 3.)  While that may be true, the PREPA Defendants failed to provide a copy of this attachment and thus this Court finds that Plaintiffs have adequately raised an issue of fact regarding whether the employees alluded to in the Verification Notification are employees that were under the supervision of Plaintiff.   (Docket No. 144 ¶ 12.)  However, the fact that the document concludes that thirty-eight employees from the Isabela commercial office reflected inconsistencies between their Time Sheets and the corresponding Security Logs between the periods of March 17 and May 25 of 2013, period during which Plaintiff was one of the supervisors of the office, is deemed admitted.  (See Docket No. 125 ¶ 1, 11-12.)  It is also admitted that Plaintiff's duties included signing and authorizing the Time Sheets of the employees under his supervision.  (Docket Nos. 125 ¶ 13; 144 ¶ 13.)

On August 19, 2013, Plaintiff received notice that was being suspended, with pay, for allowing employees under this supervision to record hours not worked in their Time Sheets.  (Docket No. 125 ¶ 16.)  Plaintiffs admit that employees under his supervision issued sworn statements in which the employees claimed that Plaintiff allowed them to misrepresent in the Time Sheets the hours that they actually worked.  (Docket Nos. 125 ¶ 17; 144 ¶ 17; 125-1.)  However, Plaintiffs claim that this was all as a result of a prior agreement between the UTIER Defendants and the PREPA Defendants under which the PREPA Defendants demanded that the UTIER

Civil No. 14-1631 (GAG)

Defendants coerce some of their members into providing false sworn statements against Plaintiff in order to remove him from his employment on account of his affiliation to the NPP.  (Docket No. 144 ¶ 17.)

As discussed previously, the only evidence Plaintiffs allege to support this conspiracy theory is a statement made by Oppenheimer-Soto in his deposition in which he implies that he may have met with the UTIER Defendants and agreed to the preliminary settlement agreements prior to the suspension letters being issued.  (Docket No. 144 ¶ 17; 144-4 at 22, 32, 34.)  A conspiracy such as the one previously described between the Defendants cannot be reasonably inferred from this statement, and, in any event, existence of the conspiracy would still not contradict the fact that the employees provided said sworn statements.  As such, this Court deems admitted the fact that employees under Plaintiff's supervision issued sworn statements in which they stated that he allowed them to misrepresent in the Time Sheets the hours that they worked.  (Docket Nos. 125 ¶ 17; 125-11 at 1-3.)

Finally, it is uncontroverted that among the employees that suffered adverse employment actions as a result of the internal investigation related to the fraudulent payroll scheme in the Isabela commercial office there were members of both political parties.  (Docket No. 125 ¶ 25.)  Plaintiffs seek to qualify this statement by adding that all of the supervisors that were suspended were affiliated to the NPP, and that the only PDP members that were suspended were some of the union members that were eventually reinstated.  (Docket No. 144 ¶ 25.)  Devoid of any evidence showing that there were other supervisors, not affiliated to the NPP, that did not suffer adverse employment actions, but that may have incurred in similar misconduct, Plaintiff's qualification does not further his case.

Civil No. 14-1631 (GAG)

The PREPA Defendants have thus met their burden to establish non-discriminatory reasons for Plaintiff's adverse employment action.

### 3.  Pretext

Once a defendant sets forth a <u>Mt. Healhty</u> defense, the purported non-discriminatory grounds can still be discredited if a plaintiff demonstrates the defense's pretextual character. Plaintiff can show that Defendant's "offered explanation is unworthy of credence." <u>Acevedo-Díaz v. Aponte</u>, 1 F.3d 62, 67 (1st Cir. 2011).  "The evidence by which the plaintiff established her *prima facie* case may suffice for a fact-finder to infer that defendant's reason is pretextual and to effectively check summary judgment." <u>Padilla-García</u>, 212 F.3d at 78.

In this case, however, this Court concludes that the minimal evidence offered by Plaintiffs to establish their *prima facie* case is insufficient for a reasonable fact-finder to infer that the PREPA Defendants reason for suspending Plaintiff was pretextual.  Plaintiffs' pretext argument rests, at best, on three elements. First, that the PREPA Defendants are affiliated to the PDP and that Plaintiff was an active member of the NPP.  (<u>See</u> Docket Nos. 144 ¶ 26; 144-1 at 28, 144-2 at 14-14, 144-4 at 12-13.)   Next, Plaintiffs claim that only NPP affiliated supervisors were suspended.  (<u>See</u> Docket Nos. 144 ¶ 26; 144-1 at 117.)  Finally, they claim that Oppenheimer-Soto stated in his deposition that he may have agreed to the settlement agreements with the UTIER Defendants members prior to issuing the suspension letters.  (Docket Nos. 144 ¶¶ 18, 26; 144-4 at 32-35.)  These settlement agreements included the condition that the suspended union members issue sworn statements against Plaintiff detailing his alleged involvement in the fraudulent payroll scheme.  (Docket No. 144 ¶ 16.)

Plaintiffs' first contention is clearly unavailing since evidence of opposing political affiliations, taken alone, does not undermine the PREPA Defendant's legitimate non-

Civil No. 14-1631 (GAG)

discriminatory reason for suspending him. See Mercado-Alicea v. P.R. Tourism Co., 396 F.3d 46, 52 (1st Cir. 2005).  The second argument was previously rejected, as no evidence has been presented that PREPA's internal investigation was targeted against NPP affiliated employees or that there were other supervisors affiliated to the PDP who were not investigated.  On the contrary, this Court has deemed admitted the fact that members of both parties suffered adverse employment actions as a result of the investigation into the fraudulent payroll scheme in the Isabela commercial office.  (Docket Nos. 125 ¶ 26; 144 ¶ 26.)  Plaintiff's third argument has been also previously rejected, given that Plaintiffs have not offered any evidence from which it may be reasonably inferred that Oppenheimer-Soto and the UTIER Defendants had an agreement intended to falsely implicate Plaintiff in a fraudulent scheme, much less that they did so because of his affiliation to the NPP.

Even drawing all inferences in their favor and viewing the evidence in the light most favorable to their case, Plaintiffs' have failed to undermine the PREPA Defendants' legitimate, non-discriminatory, motives for suspending Plaintiff.

In light of foregoing, the Court finds that the PREPA Defendants have successfully established legitimate non-discriminatory grounds for the adverse employment action taken against Plaintiff and that Plaintiffs have failed to raise a genuine issue of material fact as to those legitimate non-discriminatory grounds. The adverse employment action would have been taken regardless of Plaintiff's political affiliation given the evidence that was presented regarding his involvement in a fraudulent payroll scheme. Accordingly, Plaintiffs' claims under section 1983 for violation of their First Amendment rights are **DISMISSED**. The PREPA Defendants' motion for summary judgment at Docket No. 124 is **GRANTED.**

Civil No. 14-1631 (GAG)

       D.  Fifth Amendment Claims

The Complaint makes vague references of a section 1983 claim based on violations of Plaintiff's Fifth Amendment rights.  (See Docket No. 1 ¶¶ 1, 90-92; see also ¶ 85.)  Plaintiffs, however, have stated that they "conce[de] Defendant's argument regarding the dismissal of any Fifth Amendment Claim inadvertently expressed by Plaintiff."  (Docket No. 143 at 8.)  To the extent that the Complaint's second cause of action (Docket No. 1 ¶¶ 90-92) was pleaded under the Fifth Amendment and was not addressed in this Court's dismissal of Plaintiff's Fourteenth Amendment claims, those claims are hereby **DISMISSED**.

       E.  Puerto Rico State Law Claims

Plaintiffs invoke this Court's supplemental jurisdiction and assert Puerto Rico state law claims under article II, sections 1, 7, 8, 9, and 19 of the Puerto Rico Constitution and article 1802 of the Puerto Rico Civil Code, P.R. LAWS ANN. tit. 31, § 5141.  (Docket No. 1 ¶¶ 1, 96.)  The Complaint's only reference to Defendants' alleged violation of Plaintiffs' rights under state law is the following: "[a]s a direct result of the unlawful, reckless, grossly negligent, wrongful, arbitrary actions and/or omissions carried out by Defendants, Plaintiffs due process rights under the Constitution of the Commonwealth of Puerto Rico were violated."  Id.  The UTIER Defendants did not address these claims on the merits.  (See Docket No. 127.)  On the other hand, the PREPA Defendants moved for a dismissal on the merits of Plaintiffs' claims under article II, section 8 of the Puerto Rico Constitution.  (Docket No. 124 at 13-14.)  They also move for a dismissal of Plaintiff's claims under article 1802 in so far as they are based on violations to Plaintiffs' rights under article II, section 8 of the Puerto Rico Constitution.  Id.

Civil No. 14-1631 (GAG)

Generally, dismissal of a plaintiff's federal claims well before trial will trigger the dismissal without prejudice of any supplemental state law claims.  Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995).  However, in certain situations, a federal court may retain jurisdiction over state law claims even after dismissal of all federal claims.  Id.  The exercise of supplemental jurisdiction is "wholly discretionary" and determined on a case-by-case basis, with due consideration to factors such as judicial economy, convenience, fairness, and comity.  Id.

In this case, interests of judicial economy, convenience, and fairness pull the Court towards retaining jurisdiction.  The factual record has been fully developed, discovery has closed, the federal and state claims arise from the same common nucleus of operative fact, and Plaintiff has elected to litigate in the federal forum.  See Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 257 (1st Cir. 1996) (affirming the district court's discretionary decision to retain jurisdiction over supplemental state law claims for similar reasons).  For the reasons set forth below, the Court **DISMISSES** all of Plaintiffs' Puerto Rico state law claims.

### 1. Article 1802

To succeed in an Article 1802 claim the plaintiff has to plead and prove that: (1) the defendant incurred in culpable or negligent conduct; (2) that the plaintiff suffered injuries or damages; and (3) plaintiff's injuries were a result of the defendant's negligent or culpable conduct. P.R. LAWS ANN. tit. 31 § 5141. As discussed above, Plaintiffs have failed to proffer any admissible evidence to show that Plaintiff was discriminated against, that he was in any way harmed by any of the Defendants, or that the Defendants incurred in negligent or culpable conduct. Therefore, the essential elements of a claim under Article 1802 of the Puerto Rico Civil Code cannot be proven. For that reason, the Court **DISMISSES** Plaintiffs' Article 1802 claim.

Civil No. 14-1631 (GAG)

### 2. Puerto Rico Constitution

Plaintiff pleads a cause of action under article II, sections 1, 7, 8, 9 and 19 of the Constitution of the Commonwealth of Puerto Rico.  (See Docket No. 1 ¶ 96.)  The Complaint, however, does not formulate any factual allegations specifically addressing these claims and Plaintiffs have made no effort to put this Court in a position to grant its claim for relief under the Puerto Rico Constitution.

"A party may not simply throw a statutory reference into a complaint hoping to later flesh out its claim with facts in support." Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 88 (1st Cir. 2008).  Yet, that is precisely what Plaintiff has done.  Plaintiffs have failed to meet even the most basic pleading requirements for any claim under the Puerto Rico Constitution.  See id. at 87-88 (affirming the district court's decision not to address plaintiff's passing statutory reference to Puerto Rico state law claims when plaintiff did not assert the viability of those claims in opposition to summary judgment); Colón-Fontánez, 660 F.3d at 46 (finding no error in a district court's determination not to consider an "entirely unarticulated" claim).

"Judges are not expected to be mindreaders. Consequently, a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (citations omitted).  As has been discussed throughout this opinion, Plaintiffs have vaguely plead the existence of a scheme by the PREPA Defendants and the UTIER Defendants to conspire against and falsely implicate Plaintiff in a fraudulent payroll scheme in order to remove him from his employment at PREPA due to his affiliation to the NPP. Given that the Court has already ruled that Plaintiffs have not set forth any evidence from which it may be reasonable inferred that the aforementioned scheme took place, and Plaintiffs have not

**Civil No. 14-1631 (GAG)**

plead any other facts on which to base these claims,  the Court finds that Plaintiffs have not showed that a material fact as to the claims under the Puerto Rico Constitution is in genuine dispute.

Therefore, the Court **DISMISSES** Plaintiffs' claims arising under article II, sections 1, 7, 8, 9 and 16 of the Puerto Rico Constitution.

**V.      Conclusion**

For the foregoing reasons, the Court **GRANTS** the UTIER Defendants' motion for summary judgment at Docket No. 128, and **GRANTS** the PREPA Defendant's motion for summary judgment at Docket No. 124.   Plaintiffs' claims are hereby **DISMISSED with prejudice**.  Judgment shall be entered accordingly.

**SO ORDERED.**

In San Juan, Puerto Rico this 18th day of January, 2017.

*/s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
UNITED STATES DISTRICT JUDGE